Authority. Welcome to our oral argument. Our first case for today is 2017-508-52, Papalote Creek v. Lower Colorado River Authority. You may proceed. May it please the Court, Ben Mesh is here today on behalf of Papalote. L.C.R.A.'s stated dispute concerning the interpretation of a limitation of liability clause does not fall within the scope of the party's agreement to arbitrate, only disputes with respect to performance. L.C.R.A.'s claim concerns remedies, not performance, because interpreting the limitation of liability clause does not involve either party's performance and will not define what L.C.R.A. must do. Instead, the provision's meaning relates to potential consequences if L.C.R.A. breaches the agreement. So this morning, I would like to address three points with the Court, first, the interpretive framework that controls the interpretation of the arbitration provision, second, that L.C.R.A.'s claim is not covered by the clause, and third, that L.C.R.A.'s interpretation of the clause shatters any meaningful limitation on the provision's scope. And I want to turn first to the interpretive framework. And just so we're clear, neither party here is arguing delegation, right? That's been put to one side. That's correct, Your Honor. There was an order from the Court in mid-December on that point, exactly. So to properly interpret and apply the contractual text, the Court should be guided by the first principle set out in the Supreme Court's decision in Granite Rock, and that is arbitration is strictly a matter of consent. And so arbitration is a way to resolve those disputes, but only those disputes that the parties have agreed to submit to arbitration. So it should be or – arbitration should be ordered only if the identified dispute actually falls within the scope of that provision. So with these principles in mind, I want to turn next to why L.C.R.A. has not identified a dispute that falls within the scope of the provision. And I think it's helpful to begin with what is that dispute? What have they identified? And I would direct the Court to L.C.R.A.'s request for a – their motion to compel arbitration that they filed in the alternative on remand after this Court reversed in the first case. And there, L.C.R.A. defined the dispute as, quote, over the meaning of the liability limitation in the party's power purchase agreement. And you can find that reference on page 1464 of the record. But more particularly, as the Court observed in the first Papalote case, this case is really about, quote, differing interpretations, close quote, of the language in section 9.3 of the agreement. And here is the pertinent language. And I would note that in L.C.R.A.'s brief discussing what claim falls within the scope of the they're seeking to arbitrate. So I would just direct the Court to section 9.3, which is at page 7 – I'm sorry, tab 7 of our record excerpts, page 27 of the PPA. And what that language says is, quote, buyer's damages. And that's really the point. Buyer's damages for failure to perform its material obligations should likewise be limited in the aggregate to $60 million. This is a purely interpretive dispute. And let me explain what L.C.R.A.'s position about it is. What they – their interpretation hinges on the language buyer's damages. What they want, what they have – what they ask in the arbitration, what their interpretation does, is really seek to flip some words there. And let me provide some more information on that. Because in the first Papalote case, the panel noted that the real issue in the case was the, quote, word choice. So the use of liability in the first sentence of section 9.3 paired with the use of damages in the second sentence, that was what was key to resolving the dispute. And further proof of that point is the – is the arbitration proceedings that were – that have since been vacated, but where L.C.R.A. argued that 9.3 should be read as limiting its liability to $60 million because it claimed there was a typo in the agreement. So, again, the dispute in this case is interpretive. It is, in fact, boils down to is there even a cap, a liability cap at all. And it's based on L.C.R.A.'s position that there's a drafting error in how to read the provision. Counsel, what would you say to the argument that interpretation of a contract always has something to do as related to the performance of the contract? Well, I don't think every interpretive dispute can fall within the scope of the arbitration clause because the – because the language is cabined to performance disputes. So I think, for example, there can be disputes that are interpretive that speak to – speak to performance. So by way of example, we – in our contract, in Section 2.1, we have a term provision which says there's an 18-year term. But what if, for example, because we have a typo theory that's been asserted here, what if it said – wrote out 18, but in the parenthetical it said 15, and you had to interpret – what does that mean? Was it a 15-year term or an 18-year term? That would be an interpretive dispute that would be subject for performance. It's a term of performance. It's a term of performance. It's what has to be at issue, exactly. And what our submission to the Court is, is that there are no performance inputs, and the interpretation of Section 9.3 produces no performance outputs. And let me explain why that's true. Because whether or not 9.3 contains a typo or some other drafting mistake can be readily determined without understanding what the performance obligations are or whether, in fact, the parties are doing them. And ultimately, whether the provision does cap liability at $60 million, as LCRA argues, does not define what LCRA must do under the contract. Because we already have the answer to that question. LCRA's view, as they express on pages 28 and 29 of their brief, is that we have two alternative performance obligations in this contract, and what they say is either take the power or they will pay for unpurchased electricity, what they say on these pages of their brief, each month for the term of the contract that's 18 years. So we know what the performance obligation is. So what is it that what dispute has LCRA identified? And it really is about the meaning of the limitation of liability provision, which relates not to the ---- Roberts. Just to be clear, I think as you've argued, to be fair, I think you are articulating the other side's position. But in order to articulate it properly, I think it's a notion that there are two different ways for them to perform under this contract. That's right. Let's say 9.3 had been drafted differently, because I credit your point that 9.3 explicitly refers to damages. Let's say it had said alternative performance methodology. Would you then concede that this is performance? I think if the language of 9.3 is written differently, yes, but I think the answer ---- Is it a magic words analysis? I don't think it's a magic words analysis. I think it really is the substance of Section 9.3. And what 9.3 speaks to is the consequences of a material breach of the contract. Why ---- that would be one way to formulate it, agree with that. But why couldn't you also alternatively formulate it as two different ways of performing? The contract certainly could be written this way, written in that way. It was not done so here. And I don't think that is the substance of the agreement here. Remember, 4.3, what they call the alternative performance obligation ---- Well, what makes something performance versus breach and damages? Well, I think what makes something breach is what the fundamental obligation to do is under the contract. And here there are two things to do. Either take the ---- on LCR's behalf, either take the power or pay for power they don't take. Those are the things to do. Let's say that I'm buying a house, or at least I'm thinking about buying a house, and I enter into a standard agreement. I end up backing out of it. I lose my earnest money. Do we think of earnest money as performance or as a damages or as an alternative method of performance? Well, I think ---- I'm paying for ---- you could make the argument I'm paying for the right to tie you up, right? You have to sell to me if I want it. Right. And I think in that ---- in the earnest money context, I think we would typically think of that as a sort of condition proceeding for going forward under the agreement, and it would be performance. But I would say here that ---- So earnest money, the payment of the 30 grand or whatever it would be, that is an alternative way to perform. I could buy the property, or I could pay you the earnest money for the right to tie you up for 30 days. Right. But I mean, you ---- So why does that not port over here? Well, I ---- but I ---- maybe I'm not understanding the question, but I think the point is, yes, the provision in 4.3 does constitute that kind of performance. But what is at issue in this case is how you interpret Section 9.3, which they read as a limitation on libel. So even if you adopt the interpretation they're asking for, what this is really about is the consequences of a material breach of the contract. I guess what I'm asking is why can't ---- what would be wrong with construing 9.3 as essentially a way of calculating the amount of earnest money to ---- And the reason is, Judge Ho, is because that's not what the language of the provision says. So it is ---- you're focusing on magic words. I'm focusing on the language in the parties' agreement, which I think is the exact way to look at this question under Granite Rock and many of these cases, this Court's cases, which is how do you interpret what the parties agreed to do here? And I think they define the scope. In the real world, the parties define what's performance and what's breach. It's not judicially defined. It's ---- if the parties had said ---- and had said performance, you would concede. But the parties here said damages, and so you think you should win. I think you have to look to the contract to define what it is and how the parties defined it here. What do Texas courts say on this question? Well, I think courts do make interpretation decisions all the time, of course. And when I say that it's up to the parties to decide, what I'm really saying is courts interpret the language that the parties agreed on to make a call about that. And so I think that's fair here. And frankly, this is Elsieri's position that they've taken. That's what Judge Sparks ruled both times, longer before him in the district court, that that's the right interpretation of the provision, that it's a performance provision. Do you have a case, though, in Texas that would be supportive of your position that you want to highlight today? So I think, I mean, just in terms of how to interpret the arbitration clause, I think what we would look to is, you know, really the best two authorities are, one, the Granite Rock case, which says you use contract interpretation principles. But you would acknowledge that this, what we're deciding here, is a matter of Texas ---- Oh, absolutely. Absolutely. ---- have Texas courts, has the Texas Supreme Court, answered this question? No. I do not believe the Texas Supreme Court has answered this particular question. Is this a typically recurrent? I'm sorry. He said he had two cases, and he only named one to answer my question. Could you give the second case? Absolutely, Your Honor. The second case is the Beckham case, which is a district court decision by Judge Southwater ---- I'm sorry, by Judge Fitzwater, by Judge Fitzwater, that interpreted what an arbitration clause involved intent, and what was at issue in that case was a performance dispute. That's what had been alleged. And what Judge ---- what the court did in that case was the court applied Texas contract law principles to interpret the meaning and scope of the arbitration clause. The point is we don't have Texas courts, and specifically the Texas Supreme Court, we don't have a case from them. What I'm trying to ask is whether this is something that we should certify to that court. Is this the type of language, this performance language, typical in PPAs? It is not. Is it a recurring issue? It is not. And I think that's a really important point. It is not typical in PPAs. So with the typical language, it's not typical really in any kind of commercial arrangement. I mean, the typical arbitration clause, as the Court is aware, is the broad, any-and-all disputes clause. I think under the agreement. Yeah. And you also see, and it's referenced in the parties' briefs, other clauses that have been interpreted to be broad. For example, ones that say intent and performance, and that's interpreted to be broad because it really covers the entire waterfall of the contract. But here, the parties did not choose that language. And the fact that they used a custom-made, they really crafted a custom-made arbitration clause to arbitrate only this set of disputes, I think, is forceful evidence of an intent to dramatically limit the scope of the arbitration clause. So to answer your question, this is a unique custom-made arbitration provision, and I don't believe it's the kind of issue that would necessarily need to be certified to the Supreme Court for that reason. You can just apply standard contract interpretation principles, looking at the language of the agreement. And ultimately, this point speaks to what I think some of the problems are with El Siri's interpretation of the arbitration clause, because it eliminates any meaningful textual limitation. What is the dispute over the limitation? The dispute is how El Siri has framed it, Your Honor, is the meaning of the limitation of liability clause. Now, to kind of dig beneath that, what I think that's really about is whether or not that language at the outset of the provision, buyer's damages, should be read as buyer's liability. That's how they want to interpret it. Sotomayor, for what? Well, that's an — I think that's not clear what kind of damages they're talking about. But they want to extract the term damages from the contract and put a liability cap on the provision. That's how they would read it. Because as written, as drafted, it doesn't make a whole lot of sense. What I'm trying to understand is, you know, all the argument focuses on is the means by which — who's going to decide that it's arbitrary or the court. And I'm trying to get a clear picture of what this is. You framed the dispute here in terms of an interpretive, but that's a characterization. And I want to know what your underlying fight is about. Yeah. Well, Your Honor, and I'm just going to read you what I think, Elsery, how they've defined the dispute. They say it's over the meaning of the — No, no, no. You tell me what the dispute is. In our view, the dispute is whether there's a $60 million cap at all. That is the dispute. Whether there's a cap at all. Whether there's a cap at all. Because it's our — And the cap is there as an alternative to performance. No. The cap is not there as an alternative to performance. The paying of — Well, we'll give you — we pay you $60 million we don't take. But that's not what the contractual language actually says. What their obligation under 4.3 is to pay, as calculated under 4.3, if they don't take the power. If they don't take the power, that's right, they don't take, they pay the $60 million. For the term of the agreement. For the term of the agreement every month for the 18-year term of the agreement. And what the liability — limitation of liability provision is about is really the consequences if there's a — What do you want out of the — what do you seek in this lawsuit? Put aside whether it's decided by an arbitrator or by a court, what relief do you seek? Our position is that — well, they have made the claim in the case that they've made the declaratory judgment action. That is not ours. But our view is that there's not a cap — there's not a $60 million aggregate liability cap. So you get the money for the whole term of the contract? That is our position. Instead of being capped at the end. So how much — what's the difference? What is the amount? Well, so over the course of the agreement, I think the payment — it just kind of depends on the price of power. But in terms of the 4.3 obligation, but it's a multi-hundred million dollar obligation under the 18-year term of the agreement. Because power is paid at $64.75 a megawatt hour. So it's a very substantial economic impact. And for these reasons, we request that the court reverse the district court judgment. Thank you. May it please the court. I'm Bob Wise. I'm an LCRA lawyer. And I'd like to begin by answering Judge Higginbotham's question. What's this dispute about? And to do that, you've got to look at what the contract is. And what this — what the PPA basically imposes is a take-or-pay obligation. And LCRA has two alternative obligations. And Papalote doesn't dispute it. Its first obligation is it can buy all the electricity that the wind farm produces. Or alternatively, it can make a payment. And for whatever reason, the PPA refers to that as liquidated damages. That's the pay obligation. And what this — You say for whatever reason, but — I mean, it's really not liquidated damages. They just called it liquidated damages. It's a payment obligation. If you don't take the electricity — Why not call it a payment obligation? Why not call it a performance — you all could have written it as — I understand, Your Honor, but we have no evidence in the record why it's called liquidated damages. But it is a payment obligation. If you don't take the electricity, you make a payment as calculated by Section 4.3. That's a payment obligation. But if a court finds your — forget the parties here — if a court in a breach-of-contract case finds a breach and orders the payment of damages, that's a payment obligation, too. You're obliged to pay what the judgment requires. That's right. I'm not sure. I think the question is, where does the payment obligation come from? Is it a — is it performance, or is it damages? It is performance, because in a take-or-pay contract, there are two alternative performance obligations. And this isn't cited in our brief, but the leading Texas case is the NAPI Resources Corp. v. Texas Gas Pipeline. This isn't cited in the brief. This is the leading case. This is on take-or-pay contracts. It's just a definition of a take-or-pay contract. Do you have a copy of this, if you were going to bring it up? I've got a copy. I can give them, Your Honor. But — Okay. Then, if you have a response to this case, you can file it in a 28-J by Wednesday. And Your Honor, the case just simply stands for the proposition that in a take-or-pay contract, there are two obligations. One is take. One is pay. That's what the district court held. And the issue here, Your Honor, boiled down to its essence, is how much is the pay obligation. It's the amount that LCRA has to pay if it elects to use the alternative. The alternative is not take the electricity, but pay. And the issue is the amount. Let me put the question to you this way. If this case were tried in the United States district court and to a jury, what's the question you would ask? What's the liability issue that you would put to the jury under Rule 49? Did you find a proponent for the evidence of that? The ultimate issue is how much money does — What do you ask the jury? — how much money is LCRA's pay obligation, the alternative obligation, limited to $60 million, yes or no? And that's why it's a performance dispute. What Papalote is telling you is — No, let's go back to the question. You're going to ask the jury what? You're going to ask the jury, is LCRA's payment obligation — not the take obligation, the payment obligation — limited to $60 million? That's the dispute between the parties. LCRA's position is we can exercise the alternative performance obligation, which is to pay, which Section 4.3 describes as liquidated damages. And the dispute is how much, what is the amount of the liquidated damages that LCRA has to pay? Why isn't that just on its face a damages question, not a performance question? Because it's a — How much damages do we owe? It's not damages. But it's damages on the face of the contract itself. No, Your Honor. Does it not say damages on the face of the contract itself? The contract defines the pay obligation as liquidated damages. But it's a take-or-pay contract. And the alternative obligation, the dispute is what's the amount of that alternative obligation? What's the amount of damages that you owe to them if you didn't take the power? It's not — it's not damages, Your Honor. It's the performance obligation. What's the maximum amount of the pay in the take-or-pay that we owe? Okay. Do you agree that the Arbitration Clause only covers performance-related disputes? Do you agree with that? Yes, Your Honor. Not interpretation disputes? Yes. Okay. Does your interpretative theory have the — your interpretative theory have the effect of writing into the clause interpretation-related disputes? Our theory does not, Your Honor. And — and the reason being is under Papalote's construction, all we're — all you're allowed to do is determine can we take or pay? What we're saying is the scope, the extent of the pay obligation is what's at issue. And if you look at the language of the arbitration provision, that's Section 13.1, what it says, if any dispute arises with respect to either party's performance, first you have to try to negotiate, and then you go to arbitration. So the two key words are performance and with respect to. And in their brief, Papalote — in its brief, Papalote argued that performance is the successful completion of a contractual duty. Well, that's too narrow. The definition of performance is also the doing or completion of an act or the act of performance. So what it relates to is not just your past performance, but your ongoing and future performance. The words with respect to means relate. So any dispute that relates to performance is covered by this clause. And what we're saying is that the scope of the pay payment, of the pay obligation, the alternative obligation, relates to performance, because we don't know. Let me ask you, though, if this is before an arbitrator, you say it's an interpretive problem. He's going to interpret it, and if he interprets it one way, he's going to say that he's going to have to go forward and determine the amount of damages that are due, not under that clause, but for the breach of the contract. Is that right? No, Your Honor. We haven't — that's the thing that I think you all are getting hung up on. It's called liquidated damages, but it's not damages. No, I understand that. You're kind of hung up on your answer, too, because that's the same answer you give the question being asked three different ways. And, Your Honor, here, the issue is how much do we have to pay. We're only in breach. The arbitrator is going to determine whether or not it's $60,000 or it's some other number. Yeah, and what their — Some other number. Some other number. What is that other number? Their position is it's unlimited. That we — No, it's not unlimited. It's a measure of damages on a contract. Well, what their position — our position is the alternative obligation is $60 million. I appreciate that, and I'm not — I understand your argument. I'm just — I'm looking at what an arbitrator — if I'm an arbitrator, I'm going to decide. If I agree with you that it's a — it's taken — put this construction due payment, this is an alternative means of performance, it's not performance, and it's the gap, the companies that only pay $60,000 and not some other amount, and then suppose I disagree with that as an arbitrator, heaven forbid, as you would say, then what? Do you go back to court to cover damages, or is it arbitrary to go forward and determine the damages for the breach of the contract? What — In other words, if he answers the interpretive question against you, where are we? What their position is — and there are only two possibilities. One is the alternative obligation is capped at $60 million, as we say. The other alternative is it's not capped. So throughout the 18 — I understand. But I'm taking — suppose that other alternative is not capped, does that end the arbitration? Do you — Yes. And then you come back to court. That's — if — if the arbitrator says it's not capped, we have two options. Our option is to continue to either take the electricity or pay the payment, or if we don't make the payment, then we're in breach, as Judge Sparks said. It's only if we don't take the electricity and don't make the payment that we're in breach, and then you have an issue of what are the damages for breach if we don't make the — make the — make — take or pay. My assumption in reading the contract is that this is a risk allocation of the market, effectively and functionally, because what it does is it simply says you — you can — you can — if the market moves in the right direction, you — you're better off paying 60 than — and taking — you're getting another source, correct? That's — that's right, Your Honor. So it's a market allocation risk, and that's — and that's all you — and that's what — that's what — But — but what it does, Your Honor, it's tied to the scope of the pay obligation. And that's the key. We have to — we are not in breach as long as we take the electricity or we pay for the electricity. At that point, where — where in the contract do you see that you are not in breach? Because it calls it a remedy. And a remedy is for something when you've been — when there's been a breach or a damage. It doesn't call it an alternative pay or a — it — where do you get this idea that you're not in breach if you do this? Because if we don't take the electricity, what we do is we have to make the payment, and they're not — Where in the contract do you get this? It's 4.3, Your Honor. Right. And — Where in the contract does it say that these are — these are alternative performance mechanisms? The — the contract doesn't specifically say they're alternative performance obligations. But if you read the contract — I understand. If we don't — if we don't take — I understand, Your Honor. If we don't take the electricity, are they allowed to terminate the contract and sue us for breach? The answer is no. They're not. Right. The exclusive remedy for the breach is the liquidated damages under the terms in the very next section. But it's not — I'm telling you where that's not accurate, under the terms of the contract. Your Honor, it's — it's not a breach of the contract. Because if it were a breach of the contract, when a party makes a material breach, you're allowed to terminate the contract and then sue — Or you can — you can negotiate ahead of time for appropriate remedies in a contract, can't you? You can negotiate a specific remedy, yes. That's what they've done. But there's no dispute here between the parties that we have alternative obligations. When is it — well, I — And I understand what you're saying, Your Honor. If you're looking for the word alternative in Section 4.3, it doesn't exist. What's it a remedy for if it's not a breach of 4.1? It's — That's — And, Your Honor, I see where you're going, but if you — You have to give meaning to the terms that are in the actual contract. So what's it a remedy for? It's a — what the — the way the contract works is we have two alternatives. We can take the electricity, or we cannot take the electricity. I understand that's how a take-or-pay works. And that's how this — But this contract doesn't say that. But what it says is, if you don't take the electricity, you make this payment. And it's only — Or a breach. Am I wrong? Does it say that? I mean, does it say a remedy for failure to do this? Why isn't this contract set up like a normal take-or-pay? What's — maybe that's not in the record. It's — Your Honor, it's not in the record. And, frankly, if you read this contract, if you read Sections 4.2 and 4.3, there are all kinds of errors in this contract. You agree this is a very unique contract, right? It is — it is sui generis, Your Honor. Right. But if it's sui generis, why are you trying to put the take-or-pay framework that we normally use on top of this contract, rather than just applying the terms of this contract? Because it's the — it's the framework of the contract, Your Honor. We have — what the district court found, and they don't challenge this finding or conclusion, is that LCRA has alternative performance obligations. Take the energy or pay what's called liquidated damages. And it's only if we don't pay the liquidated damages can Papalote terminate the contract and then sue us for breach. That's the way the contract's set up. So there are alternative performances. I don't think they agree with you that that's an alternative performance. I believe Mr. Menchie said that in his argument a few minutes ago. Let's take your hypothetical. Let's say they did sue. What would they be then paying? Or, I'm sorry, what would you all be then paying? What if we — if we fail to — You fail to buy. You fail to take. Right. If you look at Section 6.2, they can terminate, and then they get what's called a termination payment. It's in — I forgot. It's 6.1 or 6.3. And what the termination payment is basically the difference between the market value of the future performance and the contract price. So you figure out what it is, what the future market value of the contract is, subtracted from the contract at the contract price, and that's what's called a termination payment. But they can only get that remedy, or they can use whatever other remedies they want at common law, but they only get that remedy if we fail to pay. So there are alternative performance obligations. One of — You're saying the court-imposed remedy would be different? For breach? From the liquidated damages provision? Oh, yeah. Because liquidated damages, it's a unique liquidated damages. They only get liquidated damages if they can't sell the electricity for the contract price or more. So they don't — if we don't take, and the market is above what the contract price is, they get no liquidated damages. It's an alternative to the performance, and frankly, the district court may — If there's no buy and there's no — I'm sorry. If there's no buy and there's no pay, there's actually a third option on the table, and that's what you would call damages. Well, if there's no buy and there's no pay, we're in breach. They can terminate the contract and do whatever remedies they want. And in here, in Section 6, you have a — what's called a termination payment, which is, you know, basically the market value at the time of the breach versus the contract price. And one other point I want to make is Mr. Menchie's talked about the interpretation of a — interpretation of arbitration provisions, and what he didn't mention is the specific rules for interpreting arbitration clause. And what this Court has held is that all doubts concerning the scope of the arbitration clause should be resolved in favor of arbitration. And what Papalote is basically asking this Court to do is the opposite, is to construe performance as narrowly as possible, to forget about the fact that this dispute is about the amount of the pay obligation, the amount of our performance. And what he's saying, you can't look at the scope. You have to just tell them they have to do A or B. You can't look at what the scope is. The other thing this Court said, and this is something that struck me and we quoted in our brief, it said — what this Court ruled is, quote, arbitration should not be denied unless it can be said with positive assurance that an arbitration clause is not susceptible of an interpretation that could cover the disputed issue. The key word there is could. Our interpretation of the arbitration clause is perfectly reasonable. What we're saying is that there's a dispute about what our performance is. How much money do we have to pay in this alternative obligation? What's the pay obligation? That's performance. We say it's $60 million. Papalote says there's no cap on it. You have to make those payments from today through the end of the 18-year term of the contract. And our position is simply that we've given a reasonable interpretation of this clause, and under the presumption favoring arbitrability, this Court has got to apply any interpretation unless it just can't possibly be correct. And I think that's really about all I have. I didn't expect to talk for this long in this case. Are there any more questions? No, I think we have your argument, counsel. All right. Thank you. Do you have a rebuttal? Yes, Your Honor. I want to address two points on rebuttal. First is the interpretive rules that govern, what Mr. Wise touched on last, and then how it applies in this case. So we heard a lot about presumptions and resolving doubts in favor of arbitration. I think we've established in this discussion today, this is a custom-made unique arbitration clause that governs only performance disputes. And so these generalized canons don't work very well. And I would direct the Court to Justice Thomas's writing for the Court in Granite Rock, where he says that we have never held that this policy and the policies he's referencing there is the doubt, resolving doubts in favor of arbitration, the Federal policy in favor of arbitration, overrides the principle that a court may submit to arbitration only those disputes that the parties have agreed to submit. So the way to resolve this case is like any other contract interpretation case. Look at the language in Section 13.1 that defines the scope of the dispute. And that really is the problem for El Sierra in this case, because ultimately, we heard it again today. Counsel, let me ask you the same question now about counsel Offit. You want to try this case in the U.S. District Court to a jury or a judge? So as the case is currently framed, I think it would be a question for the judge to interpret the meaning of Section 9.3. And is there, in fact, a $60 million liability cap, or is there not? Our position is there not. There is not. And so it would be a question for a court, we believe, at least as it's been framed to date, because they have alleged a declaratory judgment action. And ultimately, how — that question about how this — You think it's a pure legal question? I think as it's currently been framed, it is a legal question because it's seeking a declaration about whether or not the language in the second sense of 9.3, whether it contains an aggregate $60 million limitation of — or limitation of liability. So there's not an argument? Why is that a purely interpretive enterprise, then? It isn't. I think it is an interpretive enterprise. It is. Because if you look — what their argument is, is that that word damages shouldn't be there, and they want to substitute it out. They get there through theories of interpretation. They identify as a typographical error. We say that's not the way to read the contract. So ultimately, I think that that's what it would be. But I think that practical question does expose a very serious problem with LSA's position, because ultimately what they're asking about here is whether, if it gets an interpretation of 9.3, how will it make its decision about what to do next? And that cannot be the correct interpretation of the provision, because it would transform a custom-made performance provision to a provision that governs any and all disputes. That means virtually anything under this agreement, and if a similar construct were adopted in another agreement, would be subject to arbitration. And I think a very good test of this interpretation is the following question. What ultimate relief do you seek in the case? Our ultimate relief that we have sought in this case is to reject the interpretation that Elsery has offered. We have not filed our own declaratory judgment, but our view of the case is that there's not a cap and that we're entitled to payment for the full value of the contract. So they're seeking relief, the deck action, to say that the cap applies. That is the sum total of the relief sought in this case. Exactly, Judge Elrod. And if you look at the prior panel opinion, it kind of lays out what the claim in the case was. In a normal take-or-pay situation, these kind of provisions always appear to me to be largely hedges against the risk of the marketplace. They take or pay. We're going to perform our contract, but we also want to allocate the risk of the market moving in the wrong direction, the other direction, so that we're going to be we can cover ourselves. Right. And so we cover ourselves by making the 60, a lot of money, but making that payment by buying cheaper product. That's certainly their position, but what I would say is that Well, that's sort of the straightforward reading of the contract, that you have that kind of allocation of risk. That's what you're going about. But what I would say is that the hedge or the risk allocation device here is that under 4.3, they don't have to pay for all the power we produce. They only pay for what we're not able to sell in the market, so that the delta between When you'd characterize what you had tried in the United States District Court, it comes out very closely. It's a pure interpretive exercise of the agreement itself. And that's exactly the issue they framed. And the question before this Court ultimately is whether 9.3, interpreting 9.3 as a performance dispute. And it is not a performance dispute because it involves a limitation. Isn't this a normal take-or-pay case with a normal contract that said interpretive disputes are before the arbitrator? Would you be making this argument today? I don't believe so, because then we would have a broad arbitration clause and we'd have an interpretive provision, but we do not. And for that reason, we request the Court reverse the district court's judgment compelling this case to arbitration. Thank you, Your Honors. Thank you.